UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x

UNITED STATES,                                    :
                                                  :
                              Plaintiff,          :
                                                  :     **MEMORANDUM &**
              -against-                           :     **DECISION ON**
                                                  :     **MOTION TO**
MOETIES BROWN,                                    :     **SUPPRESS EVIDENCE**
                                                  :
                              Defendant.          :     3:25-CR-81 (VDO)

------------------------------------------------------------------ x

**VERNON D. OLIVER**, United States District Judge:

Defendant Moeties Brown is charged in a three-count superseding indictment (the "Indictment") with possessing with the intent to distribute fentanyl (Count One), possessing firearms in furtherance of a drug-trafficking offense (Count Two), and illegally possessing firearms and ammunition as a convicted felon (Count Three).[1] All charges arise from events that took place on November 20, 2024.[2] Before the Court is the Defendant's Motion to Suppress Evidence (the "Motion") obtained on November 20, 2024.[3] For the following reasons, the Motion is **DENIED**.

---

[1] ECF No. 50.

[2] *Id.*

[3] ECF No. 44 (Mot.). *See also* ECF No. 55 (Opp'n to Mot.); ECF No. 77 (Reply to Mot.).

The Court held a hearing on the Motion on March 19, 2026. *See* ECF No. 105. At the hearing, the Court requested the Government to provide several additional pieces of evidence not yet in the record. The Government provided this evidence at ECF Nos. 106-1–106-5 and 107, along with what is purportedly a cover letter at ECF No. 106. Defendant objects to the filing at ECF No. 106 to the extent that it—apart from providing the Court with a summary of provided evidence—sets forth new arguments and thus essentially operates as a sur-reply. *See* ECF No. 108. The Court agrees with Defendant and sustains the objection. Pursuant to Local Rule 7(d), "no sur-replies may be filed without permission of the Court, which may, in its discretion, grant permission upon a showing of good cause." D. Conn. L. R. 7(d). The Government did not receive permission of the Court before filing what is, indeed, essentially a sur-reply. Accordingly, the Court will not consider the arguments set forth in ECF No. 106 in deciding the Motion.

I.    **<u>FACTUAL BACKGROUND</u>**

The following facts are adopted as findings of the Court. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). The pertinent facts are drawn from the record, which includes video footage from the body cameras of the officers involved in the relevant events that occurred on November 20, 2024.[4]

Starting in September 2024, members of the Federal Bureau of Investigation's Bridgeport Safe Streets Police Task Force (the "Task Force") received information from multiple confidential informants that Defendant was selling fentanyl and crack cocaine in the area of Maple Street and Kossuth Street in Bridgeport, Connecticut.[5] The Task Force subsequently determined that Defendant lived with his girlfriend, Jessica Peeler, and her children in the second-floor apartment of a multi-unit complex at 378 Maple Street in Bridgeport, Connecticut.[6] In mid-September 2024, the Task Force set up a controlled buy with Defendant.[7] A confidential informant spoke with the defendant over the phone in the presence of Task Force officers and went to an agreed-upon location for the purpose of purchasing narcotics.[8] The informant then purchased a small amount of fentanyl from Peeler.[9] Task Force Officer Kevin Bettini saw the purchase and later collected and field tested the substance, which

---

[4] ECF Nos. 44-2, 55-1–55-10; 106-1–106-5; 107.

[5] ECF No. 56-1 at 3–4.

[6] ECF No. 56-2 at 5–6.

[7] ECF No. 107 at 4.

[8] *Id.*

[9] *Id.*

tested positive for the presence of fentanyl.[10] Additionally, Task Force members observed Defendant engage in what they believed to be multiple hand-to-hand drug transactions outside or near 378 Maple Street during September and October of 2024.[11]

On November 20, 2024, the Task Force again set up surveillance in the area of 378 Maple.[12] Members of the Task Force observed Defendant and two other male individuals, later identified as Marquis Brown and Oronde Jefferson, standing around the front porch area of 378 Maple and interacting with each other for approximately an hour. During this time, Sergeant Michael Paoletti observed Marquis Brown walk from the front of 378 Maple Street to the corner of Beach Street and Maple Street where he interacted with an unidentified female.[13] Marquis Brown then tossed an item, which members of the Task Force believed to be consistent with packaged narcotics, to the ground; the female picked it up and left the area.[14] Sergeant Paoletti, based on his training and experience, believed that Marquis Brown had sold packaged narcotics to the female.[15] Marquis Brown then returned to the porch area and continued to engage with Defendant and Jefferson.[16]

Approximately 40 minutes later, Sergeant Paoletti observed Defendant open the passenger side door of a silver Infiniti M35 (the "Infiniti") that was parked directly in front of

---

[10] *Id.* at 2; ECF No. 56-1 at 4.

[11] ECF No. 56-1 at 3–4.

[12] ECF No. 56-2 at 3.

[13] ECF No. 56-1 at 4–5; ECF No. 56-2 at 3.

[14] *Id.*

[15] *Id.*

[16] *Id.*

378 Maple Street and sit in the passenger seat.[17] Sergeant Paoletti noticed that the Infiniti was missing a front license plate.

Sergeant Paoletti then observed Defendant exit the Infiniti and immediately walk to the corner of Maple Street and Beach Street—the same corner Sergeant Paoletti had just observed Marquis Brown engage in what he believed to be a drug sale.[18] Defendant made brief contact with a suspected male drug buyer and immediately returned to the front porch area of 378 Maple Street.[19] The suspected male buyer was stopped by Task Force officers and was found in possession of a syringe—paraphernalia, based on the officers' training and experience, commonly utilized by fentanyl users.[20] Officers conducted a further canvas of the corner and found a discarded empty blue wax fold consistent with drug packaging.[21] The record is devoid of evidence that the Task Force officers who conducted the stop discovered any drugs on the suspected buyer, nor that they asked him whether he had just obtained drugs from Defendant. The record also does not indicate that officers asked the suspected buyer whether the empty wax fold was discarded by him.

### A.    Search of Defendant's Person

Based on the observations up until this point on November 20, 2024, along with the information obtained through the prior investigation of Defendant's possible involvement in drug trafficking activity from 378 Maple Street, Task Force officers converged on the area to

---

[17] ECF No. 56-2 at 3.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

conduct an investigative stop of Defendant, Marquis Brown, and Oronde Jefferson on the sidewalk outside 378 Maple Street.[22] During a pat down search of Defendant, Task Force officers recovered approximately 46.7 grams of marijuana, individually packaged for sale, along with cash and the key fob to the parked Infiniti.[23]

Task Force officers also conducted a pat down of Marquis Brown and Oronde Jefferson. They did not find anything of note on Marquis Brown's person. However, during the pat down of Jefferson, officers discovered four bundles containing 32 individual glassine folds of fentanyl and one zip bag containing 71 capsules of crack cocaine.[24] Officers also recovered a loaded Glock 9mm pistol outfitted with a high-capacity magazine containing 15 rounds, with one chambered round, from Jefferson's waistband.[25] Mr. Jefferson has since been charged under a separate indictment.[26]

**B.    Search of Infiniti**

Following the pat-down of Defendant and the discovery of marijuana on his person, Task Force members ran the rear license plate on the Infiniti, "BG06938," and learned that the license plate had been registered to a silver Mercedez Benz belonging to Peeler, Defendant's girlfriend. Because the license plate was on the Infiniti, Task Force members determined that the plate was misused in violation of Connecticut law.[27] The Task Force officers then opened the Infiniti's door and conducted a search. The officers observed, on the passenger seat in plain

---

[22] ECF No. 55-3 at 00:00–02:00.

[23] ECF No. 56-2 at 4–5; ECF No. 106-2.

[24] ECF No. 56-2 at 4–5; ECF No. 55-3 at 01:35–01:56.

[25] ECF No. 56-2 at 3–4; ECF No. 55-3 at 02:32–02:58.

[26] *See United States v. Jefferson*, No. 25-CR-80 (D. Conn.).

[27] ECF No. 55-3 at 05:27-06:30.

view, a bundle of 10 individual glassine folds of fentanyl bearing a black flower stamp and two cellphones.[28] Officers subsequently arrested Defendant and arranged for the Infiniti to be towed from the scene.[29] Defendant, after initially stating that the Infiniti belonged to Ms. Peeler,  later told the Task Force Officers that the car was "nobody's car."[30] The Infiniti was eventually determined to be owned by Maribel Correa, who was not, to the officers' knowledge, present at 378 Maple Street on November 20, 2024.[31]

### C.    Search of 378 Maple Street

Shortly after Task Force officers stopped Defendant, Sergeant Paoletti entered 378 Maple Street, the front door of which was unlocked. On the second floor in front of Defendant's apartment, in the common hallway, Sergeant Paoletti observed additional bundles containing 39 individual glassine folds of fentanyl.[32] These glassine folds contained the same black flower stamp as the narcotics recovered from the Infiniti.[33]

Around the same time, Defendant's girlfriend Jessica Peeler arrived on scene at 378 Maple Street.[34] Ms. Peeler confirmed that she and Defendant lived in the second-floor apartment of 378 Maple Street, and that there was one firearm registered to her located in her bathroom.[35] After Sergeant Paoletti observed the glassine folds in front of Defendant's

---

[28] ECF No. 56-2 at 5.

[29] *Id.*

[30] ECF No. 106-1 at 5:10–5:23.

[31] ECF No. 106-3.

[32] ECF No. 55-6 at 0:08 (Sergeant Paoletti exiting 378 Maple Street and saying "there's heroin" before Officer Hansen mutes his bodycam microphone).

[33] ECF No. 56-2 at 5–6.

[34] ECF No. 56-2 at 5; ECF No. 55-3 at 05:12.

[35] ECF No. 56-2 at 6.

apartment and exited 378 Maple Street, Peeler agreed to accompany him and additional Task Force officers inside the complex and consented to a protective sweep of the apartment she shared with Defendant.[36] Upon arriving at the apartment, Peeler voluntarily unlocked the front door.[37] Task Force officers conducted the protective sweep and confirmed the apartment was cleared of all occupants.[38] No additional property was recovered during this initial entry into the apartment.[39]

### D.    Application and Execution of Search Warrant

Based on the above information, Task Force officers applied for and received a search and seizure warrant from Connecticut Superior Court to search the second-floor apartment of 378 Maple Street.[40] During the execution of that search warrant, Task Force officers recovered multiple rounds of loose ammunition, a large vacuum-seal bag containing 372 grams of suspected marijuana, and a loaded Taurus G2C 9mm firearm (Serial #AEB081957) from inside the main bedroom, as well as a clear plastic bag containing a suspected cutting agent and a JDS-1000b digital scale from inside the kitchen.[41] Task Force officers also recovered a black garbage bag just outside the back door of the second floor apartment on the staircase landing.[42] That bag contained a loaded Taurus T-92AF-D 9mm firearm (Serial #TKB83334), two large clear plastic bags of fentanyl, a latex glove containing empty wax folds, a clear plastic bag

---

[36] *Id.*

[37] ECF No. 55-5 at 0:33.

[38] *Id.*

[39] *Id.*

[40] *See generally* ECF No. 56-2.

[41] ECF No. 56-3 at 1–3.

[42] *Id.*

containing empty blue wax folds, a second digital scale, and a black ink pad flower stamp.[43] The black flower stamp matched the stamping on the narcotics recovered from both the second-floor common hallway and the Infiniti.[44]

### E.    Federal Arrest

On May 7, 2025, a Grand Jury indicted the defendant for one count of Possession with Intent to Distribute More Than 40 Grams of Fentanyl pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi), one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime pursuant to 18 U.S.C. § 924(c)(1)(A)(i), and one count of Unlawful Possession of a Firearm and Ammunition by a Felon pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(8).[45]

After Defendant was taken into federal custody on May 9, 2025, the Honorable Judge S. Dave Vatti issued a search warrant to obtain a buccal swab from the defendant for purposes of DNA testing.[46] A subsequent comparison of the defendant's DNA to DNA found on the Taurus G2C found in Defendant's and Ms. Peeler's bedroom revealed that the DNA found on the pistol was one trillion times more likely to be the defendant's DNA and one additional contributor than three unknown contributors. Accordingly, the Grand Jury returned a superseding indictment on December 9, 2025, to add the additional Taurus G2C 9mm firearm to Counts Two and Three.[47]

---

[43] *Id.* at 4.

[44] *Id.*

[45] ECF No. 1.

[46] ECF No. 44-2.

[47] ECF No. 50.

## II.    LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To 'safeguard Fourth Amendment rights generally,' . . . the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence '[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights[.]'" *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (quoting *Herring v. United States*, 555 U.S. 135, 139–40 (2009) and *Davis v. United States*, 564 U.S. 229, 238 (2011)). Because the exclusion of evidence "exacts a heavy toll on the justice system, . . . the exclusionary rule does not apply whenever suppressing evidence 'might provide marginal deterrence.'" *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (quoting *Herring*, 555 U.S. at 141).

On "a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, that the search or seizure did not violate the Fourth Amendment." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980), *cert. denied*, 450 U.S. 917 (1981)).

## III.    DISCUSSION

Defendant moves for an order suppressing any evidence seized from his person, the Infiniti, and 378 Maple Street on November 20, 2024.[48] The motion also seeks suppression of evidence collected pursuant to the later-obtained warrant for 378 Maple Street, also executed

---

[48] ECF No. 44 at 1.

on November 20, 2024.[49] Defendant argues that the evidence was obtained in violation of the Fourth Amendment to the U.S. Constitution.[50] Specifically, as relevant in deciding the instant Motion, he asserts that members of the Task Force (1) did not have probable cause to arrest Defendant following the investigatory stop and pat down of his person; (2) improperly conducted a warrantless search of the Infiniti; and (3) improperly conducted a "protective sweep" of Defendant's apartment.[51] Finally, though Defendants ultimately obtained a warrant for 378 Maple Street, Defendant argues that this warrant was invalid based on the above violations, and that the evidence collected pursuant to it was thus the fruit of unlawful police conduct and should also be suppressed.[52]

### A.    The Initial Stop and Pat-Down of Defendant Was a Proper *Terry* Stop.

As an initial matter, the Court concludes that the Task Force officers' initial stop and pat-down of Defendant was a proper *Terry* stop, not an arrest. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized that there are circumstances in which law enforcement may detain a person suspected of criminal activity for investigative purposes. Such investigative detentions, or "*Terry* stops," are constitutionally permissible because of society's interest in "effective crime prevention and detection," and ensuring public safety. *Id.* at 22–23; *United States v. Patterson,* 25 F.4th 123, 135 (2d Cir. 2022). Specifically, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer

---

[49] *Id.*

[50] *Id.* Defendant also asserts the evidence was collected in violation of the Fifth Amendment but sets forth no legal standard or arguments in the Motion pertaining to the alleged Fifth Amendment violation. Thus, the Court's analysis is limited to alleged violations of the Fourth Amendment.

[51] *Id.* at 2–3.

[52] *Id.* at 3.

has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). "The circumstances necessary to justify a *Terry* stop are a reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).

A reasonable basis requires more than a "hunch," but the standard is "not high" and is less than probable cause. *See id.* "[I]t demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspected wrongdoing." *Id.* (cleaned up). In evaluating the lawfulness of a *Terry* stop, a reviewing court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up). The validity of a brief investigatory stop is to be "judged against an objective standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22 (cleaned up).

The Court concludes that Task Force officers had sufficient reasonable suspicion when they initially detained Defendant on November 20, 2024. First, Defendant was known to the officers based on their ongoing investigation, including a prior controlled purchase of narcotics. Officers were also familiar with Defendant personally and aware of his criminal history, which, according to the Government, included multiple violent and firearm-related

11

offenses.[53] In addition, immediately prior to the stop, officers observed Defendant engaging in what they believed to be drug-related activity in the vicinity, including an apparent transaction and the subsequent recovery of a syringe from the suspected buyer, as well as the discovery of a wax fold in the area of the transaction. Although the record does not establish that the suspected buyer confirmed purchasing drugs from Defendant, or that the recovered packaging was directly tied to him, these observations—considered in conjunction with the officers' prior investigation and knowledge of Defendant—provided a particularized and objective basis to suspect that criminal activity was afoot. Taken together, these facts exceed a mere hunch, give rise to reasonable suspicion, and are sufficient to justify an investigative detention under *Terry*.

That Defendant was immediately handcuffed does not alter the Court's analysis, given his criminal history, known to officers at the time of the stop. *See Bailey*, 743 F.3d at 340 (handcuffing permitted during a *Terry* stop when the "police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against the threat"). The Court thus concludes that this was a proper *Terry* stop and accepts the Government's contention that the investigatory stop only became an arrest following the search of the Infiniti, discussed next.

### B. The Search of the Infiniti was Proper Pursuant to the Inevitable Discovery Doctrine.

Defendant contends that the Infiniti was searched in violation of the Fourth Amendment, and that the evidence recovered from the vehicle should thus be suppressed. The Court concludes that the search of the vehicle was indeed improper under the automobile

---

[53] ECF No. 55 at 25.

exception and therefore violated the Fourth Amendment. It was also improper under Bridgeport's inventory policy. However, the evidence recovered from the Infiniti are admissible under the inevitable discovery doctrine. Accordingly, the Court declines to suppress the evidence obtained from the vehicle.

### 1.    Automobile Exception

The Government first claims the search of the Infiniti was proper under the automobile exception (also referred to as the vehicle exception). While warrantless searches are generally unreasonable under the Fourth Amendment, "there are a number of specifically established and well delineated exceptions to the general rule." *United States v. Bodnar*, 37 F.4th 833, 838 (2d Cir. 2022) (cleaned up). One such exception is the "vehicle exception," under which law enforcement may search a vehicle without a warrant if they have probable cause to believe the vehicle contains contraband or other evidence of a crime. *Id*. at 838–39. In the context of a search, "[p]robable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Stated differently, "[p]robable cause exists where the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (quoting *Gates*, 462 U.S. at 232). That is true for automobiles, too. *See Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up).

In trying to establish probable cause, the Government relies on the fact that "officers recovered a loaded firearm and a significant amount of pre-packaged narcotics from Mr.

Jefferson and a large amount of pre-packaged marijuana from the defendant…combined with the totality of the circumstances….”[54] That is not sufficient to establish the requisite probable cause.

First, it is unclear what the evidence recovered from Jefferson has to do with Defendant. Neither the record, nor any representations made by the Government in its papers or at the hearing on the Motion, reflect the nature of the connection between Jefferson and Defendant, such as any history of prior dealings between them, or any observations on November 20, 2024, suggesting that the two men exchanged items or otherwise acted in concert. Nor did Task Force officers observe Jefferson entering or exiting the Infiniti. To the contrary, the record is devoid of evidence tying Jefferson's alleged criminal activity to Defendant or to the Infiniti. That Jefferson was found in possession of contraband does not, without more, establish probable cause to believe that Defendant—much less his vehicle—was involved in criminal activity. This is especially so where Jefferson was ultimately charged separately.

The pre-packaged marijuana recovered from Defendant similarly did not establish probable cause to believe that the Infiniti contained contraband or other evidence of a crime. As Defendant correctly asserts, "if the Bridgeport officers were able to discern that the bag of marijuana [recovered from Defendant] was 4 grams above the legal limit, [possession thereof] only constituted a non-criminal civil violation," punishable by a fine.[55] That minor infraction does not give rise to a fair probability that additional evidence of criminal activity would be found in the vehicle. Nor is there any plausible basis to infer that evidence of the far more

---

[54] ECF No. 55 at 28.

[55] ECF No. 44-1 at 5. *See* Conn. Gen. Stat. § 21a-279a. (2024).

serious offenses with which Defendant was ultimately charged—namely, possession with intent to distribute fentanyl, possession of a firearm in furtherance of a drug-trafficking crime, and felon-in-possession of a firearm—would be located in the Infiniti based solely on that civil violation. Significantly, the Government does not contend that probable cause existed to search the vehicle for evidence of any marijuana-related offense, further underscoring the absence of a sufficient nexus between the observed conduct and the warrantless search.

Considering the search of Jefferson and the marijuana recovered from Defendant combined with the totality of circumstances, as the Government asks this Court to, does not alter the analysis here. It is true that the Government had been investigating Defendant and 378 Maple Street since September 2024. But that fact does not bridge the critical gap in the probable cause analysis: there is nothing in the record connecting the Infiniti to that prior investigation or to the controlled buy. Nor does the Government's reliance on the events of November 20, 2024 cure that deficiency. Although officers observed Defendant engage in what they believed to be a drug transaction at the corner, and believed he retrieved the drugs from the Infiniti, the subsequent stop of the suspected buyer yielded only a syringe—no narcotics. The empty wax fold recovered later was found in a high drug-use area, untethered to any specific individual. Most significantly, there is no evidence to suggest that officers asked the suspected buyer whether he had purchased drugs from Defendant, and no drugs were found on his person. In short, these facts do not establish any meaningful nexus between Defendant, the alleged drug activity, and the Infiniti. Accordingly, neither the contraband recovered from Jefferson, nor the marijuana recovered from Defendant, nor the broader circumstances of the investigation provided "facts and circumstances…sufficient…to warrant a man of reasonable

15

caution in the belief that evidence of a crime will be found in the place to be searched." *Gaskin*, 364 F.3d at 456. The Task Force's hunch, without more, is constitutionally insufficient.

### 2. Inventory Policy and Inevitable Discovery Exception

The Government next posits that even if there was no probable cause to search the Infiniti, the search was still proper under the Bridgeport Police Department Inventory Tow Policy (the "Inventory Policy").[56] The Inventory Policy dictates that "[a] vehicle inventory will be done any time a vehicle is towed or taken into custody for [improper registration] *and* the owner or other authorized person is not present to be responsible for its contents."[57] Further, "[t]he officer charged with the responsibility of inventorying a vehicle in police custody shall complete the standard "Vehicle Tow/Inventory Form."[58]

Here, the evidence reflects that the Infiniti was improperly registered, as its license plate was tied to a car of a different make and model, that was registered to Defendant's girlfriend. The record is less clear as to whether Task Force officers knew at the time of the search whether "the owner or other authorized person [was] not present to be responsible for its contents." On one hand, the Government's own theory of probable cause rests on officers observing the Defendant entering and exiting the vehicle, and they recovered the key fob to the vehicle upon patting him down, which at least suggested that he was an owner or authorized user. The fact that the license plate on the vehicle was registered to his girlfriend does not alter that conclusion; even if she were the owner, it is not unusual for romantic partners to use one another's vehicles. However, Defendant ultimately stated that the car was "nobody's car." And

---

[56] *See generally* ECF No. 56-4.

[57] *Id.* at 2 (emphasis added).

[58] *Id.*

16

a search of the car's Vehicle Identification Number (VIN) later revealed that it was indeed registered to a third party, who was seemingly not on scene. Thus, the Court accepts the Government's position that the Task Force officers did not know who the Infiniti belonged to.

However, the Task Force officers violated their own Inventory Policy because—despite repeated assertions to the contrary at the hearing on this Motion—they never completed the requisite Vehicle Tow/Inventory Form. Indeed, part of the Court's request following that hearing was for a copy of that form. Instead, the Government provided an empty copy of the form,[59] a wholly different Connecticut Department of Motor Vehicles Notice of Motor Vehicle Tow Form,[60] as well as photos taken throughout the search of the Infiniti.[61] These pieces of evidence demonstrate that the Vehicle Tow/Inventory Form was never completed, as required by the Inventory Policy, and the Government was thus in violation of said policy with respect to the search of the Infiniti.

Nevertheless, the Government claims, the evidence discovered in the Infiniti is admissible under the inevitable discovery exception. Under the inevitable discovery doctrine, "the fruits of an illegal search or seizure are nevertheless admissible at trial if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (cleaned up). The inevitability of discovery must be shown by "demonstrated historical facts capable of ready verification or impeachment." *Id.* (same). "The focus on demonstrated historical facts keeps

---

[59] ECF No. 106-4.

[60] ECF No. 106-3.

[61] ECF No. 106-5.

speculation to a minimum, by requiring the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Id.* (same).

Courts have recognized that, where an inventory policy would lead to discovery of the same evidence absent an unconstitutional search, the evidence of an unconstitutional search need not be suppressed. *See, e.g.*, *United States v. Mendez*, 315 F.3d 132, 139 (2d Cir. 2002) (holding that evidence need not be suppressed because it "would inevitably have been discovered in a valid inventory search"); *United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir. 1995) (holding that evidence found pursuant to an unconstitutional search of the defendant's bag would not be suppressed if it would have been found pursuant to an inventory policy, and remanding to allow factfinding as to whether the inventory policy would have applied at the time of the search).

Here, the Government claims, had the Inventory Policy been properly followed, Task Force officers would have been able to search the Infiniti and discover the evidence ultimately recovered therein. The Court agrees. Given that the principal violation of the Inventory Policy identified by the Court—the failure to complete the required Vehicle Tow/Inventory Form— occurred after the search had already been conducted, that deficiency does not undermine the conclusion that the evidence would have been inevitably discovered. In other words, had officers complied with the ministerial requirement of completing the form, the inventory search itself would still have been permissible under the Inventory Policy.

Moreover, to the extent there is any uncertainty as to whether officers knew, at the time of the search, that neither Defendant nor his girlfriend was the owner or an authorized user of the Infiniti, that uncertainty does not defeat inevitability. The record reflects that Defendant

later acknowledged that the vehicle was not his or his girlfriend's but rather "nobody's car." That information would have confirmed that no owner or authorized person was present to take custody of the vehicle, thereby triggering the officers' ability to search the Infiniti pursuant to the Inventory Policy. While this clarification may have affected the precise timing of the inventory search, it would not have altered the ultimate outcome: the vehicle would have been lawfully inventoried pursuant to standardized procedures, and the same evidence would have been discovered.

Accordingly, the Court finds that the evidence recovered from the Infiniti is admissible under the inevitable discovery doctrine, as it would have been discovered through a lawful inventory search conducted pursuant to standardized police procedures, notwithstanding the officers' failure to strictly comply with the Inventory Policy at the time of the initial search.

## C.    The Arrest of Defendant Following the Search of the Infiniti Was Proper.

Defendant next argues that Task Force officers did not have probable cause to arrest Defendant following the investigatory stop and pat down of his person. It is unclear to the Court why Defendant raises this argument in the context of a motion to suppress, given that any evidence recovered from his person was obtained prior to his formal arrest, during an investigative pat-down, which the Court has already determined was proper. Nor does it appear that the Government relies on the arrest—occurring after the search of the Infiniti—to establish probable cause for any of the challenged searches, including the subsequent pre-warrant entry into 378 Maple Street.

In any case, because the arrest followed the search of the Infiniti—which Defendant had been observed entering and exiting, and from which officers recovered ten individual glassine folds of fentanyl, evidence the Court has deemed admissible under the inevitable

discovery doctrine—Task Force officers had probable cause to arrest Defendant at that time. *See Maryland v. Pringle,* 540 U.S. 366, 369–70 (2003) (holding that the police may arrest a person in public when there is probable cause to believe he has committed a criminal offense). Accordingly, Defendant's arrest was proper.

**D.      The Propriety of the Protective Sweep of Defendant's Apartment Does Not Bear on the Propriety of the Subsequent Search of the Apartment Pursuant to the Warrant.**

Defendant next contends that the protective sweep of the Defendant's apartment was not consensual and the Government thus cannot justify the search. The Court notes that nothing was discovered or seized during the protective sweep, and no observations from that sweep— other than its occurrence—were included in the subsequent warrant application. Thus, even assuming arguendo, that the protective sweep was improper, that conclusion would not affect the admissibility of any of the evidence ultimately recovered, including the evidence obtained pursuant to the later-issued search warrant. Additionally, bodycam footage squarely refutes Defendant's assertion that the search was non-consensual.[62] Accordingly, the Court declines to conduct any further analysis of the propriety of the protective sweep in this case.

**E.      The Evidence Collected Pursuant to the Warrant Was Not the Fruit of An Illegal Search or Seizure.**

Lastly, based on all the asserted violations of the Fourth Amendment, Defendant asserts that the search warrant obtained for 378 Maple Street was invalid, and that all the evidence recovered in the apartment pursuant to said warrant was the fruit of the poisonous tree and should thus be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The Court disagrees.

---

[62] ECF No. 55-5 at 0:33.

First, the Court notes that throughout this opinion it has declined to suppress any of the evidence obtained prior to the issuance of the warrant. Specifically, the Court has concluded that (1) the initial stop and pat-down of Defendant was a proper *Terry* stop and that the marijuana recovered from Defendant was therefore admissible and (2) the Infiniti was searched in violation of the Fourth Amendment, but the evidence recovered therein is nevertheless admissible pursuant to the inevitable discovery doctrine. Separately, the Court concluded that Defendant's arrest was supported by probable cause and was therefore lawful.

But even if the Court excluded some or all of the evidence recovered pre-warrant or the fact of the arrest in the warrant application, as Defendant asks it to, that would not change the validity of the issued warrant and the evidence recovered pursuant to that warrant. The application was supported by ample independent evidence, including observation of the suspected November 20, 2024 drug transaction and the months-long investigation into drug activity at 378 Maple Street. *See United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) (citing cases and explaining that "the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant" and "a reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.").

Crucially, the application also described that Task Force officers observed, in plain view, packaged narcotics in the common hallway of 378 Maple Street, bearing stamping consistent with the narcotics recovered from the Infiniti. At the hearing on the Motion, counsel for Defendant conceded that Defendant had no reasonable expectation of privacy in the common hallway of a multi-unit building, and he therefore does not challenge the inclusion of this evidence in the warrant application. Indeed, "it is the established law of this Circuit that

21

the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." *United States v. Holland*, 755 F.2d 253, 255 (2d Cir. 1985) (collecting cases). Taken together, this untainted evidence independently supports the issuance of the warrant.

Accordingly, even if the Court were to excise all pre-warrant evidence challenged by Defendant, the warrant would nonetheless be supported by probable cause, and the evidence recovered pursuant to it would remain admissible. The Court, however, has not suppressed any of the pre-warrant evidence, which further strengthens the validity of the warrant and the admissibility of the evidence recovered pursuant to it.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion is **DENIED**.

**SO ORDERED.**

Hartford, Connecticut
April 15, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

22